Filed 8/29/24  Raggins v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VERNON RAGGINS et al., | |
| Petitioners, | |
| v. | G063500 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. 30-2021-01218115) |
| Respondent; | O P I N I O N |
| KIA AMERICA, INC., | |
| Real Party in Interest. | |

Original proceedings; petition for a writ of mandate to challenge orders of the Superior Court of Orange County, Sandy N. Leal, Judge. Petition granted with directions.  Motion to strike.  Granted in part, and denied in part.

Law Office of Kenneth J. Melrose and Kenneth J. Melrose for Petitioners.

No appearance for Respondent.

Dykema Gossett, James S. Azadian, Cory L. Webster, and Nicholas von der Lancken for Real Party in Interest.

\*          \*          \*

In this mandate proceeding, petitioners, who are plaintiffs in the underlying product defect action arising from a fatal vehicle accident, seek a writ of mandate compelling the trial court to grant their motions to compel further responses to discovery propounded on defendant and real party in interest, Kia America, Inc. (KA). The writ petition contends the trial court applied an incorrect discoverability standard in originally denying the motions and application of the correct standard requires they be granted. Although the trial court slightly modified its orders following issuance of an alternative writ by this court, plaintiffs maintain the trial court erroneously concluded most of the information and documents sought were not relevant and not reasonably calculated to lead to the discovery of admissible evidence. They further request we grant discovery sanctions against KA based on a request made in the lower court.

Having reviewed the record, we agree the trial court abused its discretion in limiting the scope of discovery to a specific generation of a single vehicle model. To the extent plaintiffs bore the burden of establishing discoverability of the requested information and documents, they did so; and, to the extent KA bore the burden of justifying its refusal to provide further responses, it failed to do so. We therefore grant the writ petition and direct the trial court to vacate the portions of its discovery orders contested in this writ proceeding and enter new orders granting the motions as to those

2

matters. We leave the sanctions determination to the trial court in the first instance.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *The Complaint*

After one of their minor children was killed in a freeway vehicle accident, Vernon Raggins and Lakeisha Griffin brought suit, in their individual capacities and as guardians ad litem for their surviving minor children, against KA and the dealership from which they purchased the vehicle involved in the accident. The complaint contains nine causes of action, with each brought against varying combinations of defendants: (1) design defect (strict liability); (2) manufacturing defect (strict liability); (3) failure to warn (strict liability); (4) negligent design defect; (5) negligent manufacturing defect; (6) negligent failure to warn; (7) negligent maintenance of a motor vehicle; (8) breach of express and implied warranties; and (9) wrongful death.

Among the allegations in the complaint are the circumstances which purportedly led to the fatal accident. Vernon[1] and his three minor sons were traveling on an uphill portion of a freeway when their vehicle, a 2017 Kia Forte (plaintiffs' vehicle), "lost power[] and came to a rapid, complete, unexpected stop in the number two lane of the freeway." Vernon, who was driving, turned on the vehicle's emergency flashers and waved his hands out the window to alert approaching drivers. Some vehicles moved around the disabled vehicle, but a van traveling at least 65 miles per hour did not. The

---

[1] We use first names to avoid confusion because some of those involved share the same last name.

3

van struck plaintiffs' vehicle "causing massive damage and severe injuries to [the Kia's] occupants." An emergency helicopter transported one of the sons to a hospital where he later succumbed to his injuries.

A subsequent California Highway Patrol (CHP) inspection of plaintiffs' vehicle allegedly uncovered that its front right half-shaft, also known as a driveshaft or a continuous velocity shaft (CV shaft), "had snapped or sheered prior to the collision." As a result, the front drive wheels unexpectedly lost power and the vehicle stalled in the middle of freeway traffic.

Plaintiffs allege KA is "strictly liable for designing, testing, manufacturing, distributing, selling and/or placing a defective and unreasonably dangerous product into the stream of commerce," with the focus being the vehicle's drivetrain components, including the CV shafts. They further allege KA had a duty to warn consumers about the known inherent and latent defects, but failed to do so, and that it acted negligently with respect to the design, manufacturing, and distribution of the foreseeably dangerous vehicle. Plaintiffs' breach of warranty and wrongful death claims against KA are based on all those alleged acts and omissions. Among the damages they seek are punitive damages.

II.

*Discovery Propounded by Plaintiffs*

During the discovery process, plaintiffs propounded multiple sets of form and special interrogatories, requests for admission, and requests for production of documents. Relevant to this writ proceeding, among the information sought in the first set of special interrogatories was information about recalls involving the front CV shafts of any Kia front-wheel drive model, including the Forte, information concerning complaints received by

4

KA related to a fracture of a front CV shaft in any of its front-wheel drive models, and information regarding all lawsuits involving a fracture of a front CV shaft of any front-wheel drive model. Each of these requests was not limited to a certain time period, but instead referenced instances occurring "[a]t any time."

The second and third sets of special interrogatories requested information concerning three recalls previously issued by KA involving other Kia models (collectively, the three KA recalls): the 2014 Sorento, the 2016 Optima, and the 2019 Forte. The 2014 Sorento recall campaign sought "to replace the right front axle driveshaft" on certain vehicles. The 2016 Optima recall campaign sought "to replace the right front axle driveshaft" on certain vehicles because it "may develop a crack in the area of the stub at the wheel end of the shaft" which could "lead to a separation of the shaft" and a possible crash. The 2019 Forte recall campaign sought "to inspect, and if necessary, replace the left front axle driveshaft" on certain vehicles. The recall notice explained that, "[d]ue to a supplier error, the left front axle driveshaft may not have been heat-treated," making it "more susceptible to breaking" which, in turn, could result "in a sudden loss of motive power, thereby increasing the risk of a crash." Among the information about these recalls that plaintiffs targeted were the names of the parties who manufactured or heat treated the CV shafts, the cause of the fracturing, and how KA discovered the need for the recall.

Plaintiffs' document production requests were similar in nature. Among other matters, they asked for the following: (1) all records of complaints received by KA or its parent corporation, Kia Corporation ("KC"), which involved a fracture of a front CV shaft of any Kia front-wheel drive model, including the 2017 Forte; and (2) documents concerning the three KA

5

recalls, including all KA and KC communications with dealerships and/or the National Highway Traffic Safety Administration (NHTSA) regarding the recalls, and photos of the front CV shaft heat treatment verification codes for the recalled vehicles.

III.

*KA's Discovery Responses*

KA's special interrogatory responses began, inter alia, with a variety of general objections and the following statement: "The vehicle at issue in this case is a 2017 Kia Forte LX 5 Door, which is part of the 2014-2018 Kia Forte generation. Unless otherwise indicated, KA's responses are limited to the subject 2017 Kia Forte, or in some instances to the 2014-2018 Kia Forte. To the extent that [p]laintiffs' interrogatories seek information or documents pertaining to other vehicles not substantially similar to the subject 2017 Kia Forte, KA objects to these interrogatories as overly broad, unduly burdensome, seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and beyond the scope of responses required by the Code of Civil Procedure." It included a virtually identical statement in its responses to the document production requests.

KA also relayed information about it and its parent company, KC. KC is a Republic of Korea corporation with its principal place of business in South Korea. KA, a California corporation with its principal place of business in California, is a wholly owned subsidiary of KC. Whereas KC is responsible for the overall design, manufacture, testing, and assembly of Kia brand vehicles, KA markets, advertises, and distributes for sale in the United States certain Kia brand vehicles.

6

Consistent with these preliminary statements, KA limited the scope of its discovery responses to either the 2017 Forte or the 2014-2018 generation Forte even though many of the requests sought information broader in scope. In addition, it stated it would not "respond on behalf of entities other than itself," and claimed not to have possession, custody, or control of many of the requested documents and information.

IV.

*Plaintiffs' Motions to Compel and Trial Court's Original Orders*

After unsuccessfully meeting and conferring with KA regarding its responses, plaintiffs filed motions to compel further responses to their interrogatories and document requests, as well as sanctions against KA for abuse of the discovery process. Plaintiffs argued KA's responses were evasive, interposed unmeritorious objections, and artificially limited the scope of their requests without any supporting legal authority. From their perspective, evidence of prior and subsequent failures in CV shafts of any front-wheel drive Kia vehicle could shed light on matters such as defective manufacturing processes, including defective heat treatment of components, and KA's knowledge.

In providing illustrations of KA's deficient responses, plaintiffs highlighted that the shortcomings went beyond model and year limitations. For example, in response to an interrogatory asking whether KA or KC "ever received complaints related to a fracture of either of the front axels (e.g. constant velocity shafts) of any Kia front-wheel drive model," KA stated, in relevant part: "KA . . . has conducted a diligent search and reasonable inquiry for lawsuit complaints filed and served against KA, on or before August 25, 2019, involving a 2014-2018 Kia Forte in which personal injury or death allegedly resulted to an occupant due to an alleged defect of the front

7

axle, CV shaft, and/or drive shaft, resulting in a rear impact, kept in the ordinary course of business, in its possession, custody, or control, and has located none. [¶] KA . . . is conducting a diligent search and reasonable inquiry for claims and Customer Care (formerly Consumer Assistance Center) Case Reports of which KA received notice on or before August 25, 2019, involving a 2014-2018 Kia forte in which personal injury or death allegedly resulted to an occupant due to an alleged defect of the front axle, CV shaft, and/or drive shaft, resulting in a rear impact, kept in the ordinary course of business, in its possession, custody, or control, which KA will produce, if any, upon entry of a suitable protective order."

KA opposed the motions, likening plaintiffs' discovery to a "'fishing expedition'" and contending it was "overly broad[,] . . . vaguely worded[, and] . . . would require KA to provide information and produce documents related to nearly every US bound Kia vehicle that has been manufactured since 1993." It argued that under California law, admission of evidence of other incidents in a products liability case is contingent on a showing of substantial similarity in physical and mechanical properties, as well as similar defects. Thus, from its perspective, it properly limited its discovery responses to Forte vehicles in the same generation as plaintiffs' (i.e. the 2014-2018 generation).

In conjunction with its opposition, KA provided the declaration of a Hyundai Motor Company (Hyundai) engineer who was responsible for the design of the mount and drive systems for the 2014-2018 generation Fortes between January 2010 and May 2016, and for the design of only the mount system beginning in June 2016. The engineer explained the functioning of the CV shaft. "A CV shaft transmits the driving force generated by the powertrain to the wheels" and it "needs to function [to] absorb a large

8

operating angle and length change according to wheel movement."

The engineer further stated he was asked to compare the front CV shafts of the Kia models that were part of the three KA recalls with those of the 2014-2018 generation Fortes. Based on his review of design drawings and specifications, he opined they "are not substantially similar generally or with respect to the CV shafts." Factors leading him to that conclusion included: (1) the design parameters of various components for the 2014 Sorento and the 2016 Optima, including size, diameter, length, static and fatigue strengths, are different than those of the 2014-2018 generation Fortes; (2) the design parameters of various components for the 2019 Forte, including size, diameter, and length, are different than those of the 2014-2018 generation Fortes; (3) the CV shafts of the 2016 Optima and the 2014-2018 generation Fortes were not manufactured by the same company, were not manufactured for the same vehicle or "around the same time frame," and the components were not manufactured by the same supplier or at the same plant; and (4) the CV shafts of the 2014 Sorento and the 2014-2018 generation Fortes were not manufactured by the same company.

Separate from these purported differences, the engineer provided information evidencing at least a few similarities. The CV shafts of the 2019 Forte and the 2014-2018 generation Fortes had the same manufacturer, as well as the same static and fatigue strengths. Additionally, the CV shafts of all the discussed vehicles were supposed to be subject to the same heat treatment process.

After a hearing on the matter, the trial court largely denied the motions. In its written orders, it explained it was persuaded by KA's arguments concerning relevance and admissibility. Specifically, it found plaintiffs (1) "ha[d] not established the likely relevance of evidence related to

9

Kia models other than the 2014-2018 Kia Forte," and (2) "ha[d] not shown information regarding models other than the 2014-2018 Kia Forte is reasonably likely to be relevant and admissible." The court made the latter statement three times in its orders.

The few points on which the court partially granted the motions included the following: (1) KA's responses concerning vehicle manufacturing, inspection, and testing processes which invoked its and KC's separate roles were evasive and required further responsive information in KA's possession, custody, or control; (2) plaintiffs were entitled to responsive information and documents concerning the 2014-2018 generation Fortes received by KA through the then present date, not just through the date of the accident; (3) KA was obligated to provide requested information concerning the manufacturing of the right front axles of the 2014-2018 generation Fortes, as well as produce "'[a]n exemplar right front axle driveshaft for the Kia 2017 model year Forte.'"

Because the court felt both parties had substantial justification for bringing and opposing the motions, it declined to award sanctions.

V.

*Writ Petition, Alternative Writ, and Trial Court's Subsequent Orders*

Believing the trial court's denials to be in error, plaintiffs filed a petition for writ of mandate in this court. Citing case law used by KA to support its arguments, which the trial court found persuasive, as well as language from the court's orders, plaintiffs argued the trial court unwarrantedly applied an admissibility standard in determining whether the information they sought was discoverable. They further argued application of the correct discoverability standard compels a conclusion that they were

10

entitled to the information they sought about all front-wheel drive Kia models and the motions to compel should have been granted in full.

Pursuant to an invitation by this court, KA filed a preliminary opposition. It argued writ review was not appropriate under the circumstances, the trial court applied the correct legal standard, and it correctly determined plaintiffs failed to meet their "burden of establishing that the matters sought are subject to discovery."

This court issued an alternative writ ordering the trial court to follow one of two courses of action: (1) "set aside and vacate its October 25, 2023, and October 26, 2023, discovery orders denying petitioner's [*sic*] motions to compel discovery, and enter a new and different order granting the motions to compel"; or (2) "SHOW CAUSE before this court why a peremptory writ of mandate should not issue."

In response, the trial court allowed the parties to provide supplemental briefing and held a hearing. Plaintiffs urged the court to take the first course of action — vacate its prior orders and enter new orders granting the motions to compel. In contrast, KA took the position that the trial court did not employ an incorrect admissibility standard in making its original determinations and came to a correct conclusion about discoverability. It nevertheless suggested the court make "minor revisions" to "remove any doubt that the [c]ourt considered the motions under the correct standard."

After taking the matter under submission, the trial court issued what it described as "new and different orders." The new orders reached all the same conclusions as the original orders and analytically varied from them in only two respects. First, prior phraseology of plaintiffs' failure to show the disputed information was "reasonably likely to be relevant and admissible"

11

was changed to plaintiffs' failure to demonstrate the information was "likely to be relevant and reasonably calculated to lead to the discovery of admissible evidence." Second, the following paragraph, drafted by KA, was added in various places: "'Although the scope of civil discovery is broad, it is not limitless.' (*Calcor Space Facility v. Superior Court*, 53 Cal.App.4th 216, 223 (1997).) '[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence.' (Code Civ. Proc. § 2017.010.) 'The burden rests upon the party seeking the discovery to provide *evidence* from which the court may determine these conditions are met.' (*Calcor*, 53 Cal.App.4th at 223, italics in original.)"

Because the trial court did not grant the motions to compel as stated in the alternative writ's first option, this court ordered the matter to proceed consistent with the second option — an order to show cause. KA filed a return to the petition, to which plaintiffs filed a reply, and the parties orally argued the issues. We now turn to the merits of the petition.

## DISCUSSION

Plaintiffs contend the trial court applied an incorrect legal standard in coming to its conclusion about discoverability of the targeted information and documents in the original orders. They further maintain the court's continued denial of the motions to compel following issuance of the alternative writ, based on their purported failure to demonstrate relevance and that their propounded discovery was reasonably calculated to lead to the discovery of admissible evidence, was an abuse of discretion. KA defends the court's original and subsequent orders. It argues the court applied the

12

correct discoverability standard in its original orders, and the subsequent orders clarified the standard applied and properly denied the disputed parts of the motions. The law and the record lead us to agree with plaintiffs.

I.

*Writ Review and Applicable Standard of Review*

"Writ proceedings are not the favored method for reviewing discovery orders because typically the delay caused by such review results in greater harm than in the enforcement of an improper discovery order." (*Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1060, disapproved on another ground in *Williams v. Superior Court* (2017) 3 Cal.5th 531, 555-556, 557-558, fn. 8 (*Williams*).) Accordingly, such review is "limited to situations where (1) the issues presented are of first impression and of general importance to the trial courts and to the profession [citation], (2) the order denying discovery prevents a party from having a fair opportunity to litigate his or her case [citations], or (3) the ruling compelling discovery would violate a privilege [citations]." (*Johnson,* at p. 1061.) Here, our intervention by writ is warranted because denial of the contested discovery would deprive plaintiffs of a fair opportunity to litigate their case.

Because management of discovery lies within the sound discretion of the trial court, we review the denial of a discovery related motion to compel for an abuse of discretion. (*Williams, supra*, 3 Cal.5th at p. 540.) Where there is a basis for the challenged ruling and the evidence supports it, we will not substitute our opinion for that of the trial court. (*OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 887.) But, this general deference comes with at least two caveats. "First, "'[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .'

13

Action that transgresses the confines of the applicable principles of law is . . . an 'abuse' of discretion."'" (*Williams,* at p. 540.) "Second. . . [a] trial court must be mindful of the Legislature's preference for discovery over trial by surprise, must construe the facts before it liberally in favor of discovery, may not use its discretion to extend the limits on discovery beyond those authorized by the Legislature, and should prefer partial to outright denials of discovery. . . . 'Any record which indicates a failure to give adequate consideration to these concepts is subject to the attack of abuse of discretion . . . .'" (*Ibid.*)

## II.

### *Discovery Principles*

"[A] civil litigant's right to discovery is broad." (*Williams, supra,* 3 Cal.5th at p. 541.) Indeed, any party may obtain discovery regarding any nonprivileged matter that (1) "is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action," and (2) "is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2017.010.)[2]

These concepts are more expansive in the discovery context than when they arise in other phases of litigation. Relevance, for example, is not limited like it is at trial to matters "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see *Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 173, fn. omitted ["[A] decision of relevance for purposes

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

14

of discovery is in no sense a determination of relevance for purposes of trial"].) Instead, relevance in the discovery context is determined in relation to the general subject matter involved in the action (§ 2017.010; *Pettie v. Superior Court* (1960) 178 Cal.App.2d 680, 687 (*Pettie*)), with a focus on whether the information sought ""might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement"" (*Seahaus La Jolla Owners Assn. v. Superior Court* (2014) 224 Cal.App.4th 754, 767 (*Seahaus*)). And, also unlike in the trial context, "'[a]dmissibility is not the test.'" (*Ibid.*) "'[T]he scope of discovery extends to any information that reasonably might lead to other evidence that would be admissible at trial.'" (*Ibid.*)

"'These rules are applied liberally in favor of discovery [citation], and (contrary to popular belief), fishing expeditions are permissible in some cases.'" (*Cruz v. Superior Court* (2004) 121 Cal.App.4th 646, 653; see also *Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 384-385.)

III.

*Discoverability of Information Sought by Plaintiffs*

The trial court's original orders denied plaintiffs discovery of information concerning vehicles other than the 2014-2018 generation of Fortes, reasoning that "plaintiff[s] ha[d] not shown information regarding [other] models . . . is reasonably likely to be relevant and admissible." Contrary to KA's assertions, the court's language was not imprecise and plaintiffs did not misread the court's orders. The petition correctly identified an obvious error in the rulings; the court applied the wrong legal standard. As our high court emphasized 50 years ago, "[i]t is settled that admissibility is not prerequisite to discovery." (*Davies v. Superior Court* (1984) 36 Cal.3d 291, 301, fn. omitted (*Davies*).)

15

After issuance of the alternative writ, the trial court modified its orders to replace the prior "admissible" language with the proper legal standard — "appears reasonably calculated to lead to the discovery of admissible evidence." (§ 2017.010.) However, because of the conclusory nature of the trial court's orders, KA's argument below that the court simply needed to modify its prior language (as opposed to change any analysis), and the unchanged nature of the remainder of the court's orders, including citations to case law concerning admissibility of evidence at trial (see *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 403-404), it is unclear from the record whether the court actually applied that correct standard. Even presuming it did, the court's ultimate conclusions are problematic.

A.        *Relevance to the Subject Matter*

Starting with relevance, the information sought about recalls, complaints, and lawsuits involving the fracturing of a CV shaft in any front-wheel drive Kia model is undoubtedly relevant to the subject matter of this case. "[R]eason, logic and common sense" compel this conclusion. (*Seahaus, supra*, 224 Cal.App.4th at p. 767.) Plaintiffs allege their vehicle had a sudden loss of motive power which resulted in it being rearended at high speed. A post-accident CHP inspection revealed the vehicle's CV shaft "was fractured and separated into two pieces," with "beach marks along the outer edge of the fractured surfaces" which "suggest[ed] the shaft had a pre-existing circumferential crack." Plaintiffs further allege a manufacturing, design, and/or failure to warn defect makes KA strictly liable, and/or liable under a negligence theory. Among their contemplated theories is that the heat treatment process used on the metal CV shaft was improper, leading to an inadequately hardened product.

16

Even if the information discovered does not ultimately support their current theories, circumstances involving CV shaft fractures in any other front-wheel drive Kia vehicle, including those that led to KA recalls, will certainly help plaintiffs evaluate their case. It also may facilitate settlement or aid them in trial preparation. (See *Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1616 [if information sought would assist party in evaluating case or preparing for trial, "[t]hat is enough to justify discovery" from relevancy standpoint].) Contrary to KA's focus, relevance in the discovery context is not limited to relevance to the issues determinable in the case. (*Ibid.*; *Pettie, supra*, 178 Cal.App.2d at p. 688.) Holding otherwise would put the cart before the horse because it is through discovery that one ascertains and refines the issues, theories of liability, and defenses to be determined at trial. (See *Williams, supra*, 3 Cal.5th at pp. 545, 551; *Davies, supra*, 36 Cal.3d at p. 299.)

KA faults plaintiffs for failing to provide evidence via declaration, as opposed to argument, demonstrating the information they seek is relevant. To support this argument, they cite *Calcor Space Facility, Inc. v. Superior Court* (1997) 53 Cal.App.4th 216 (*Calcor*). We are not persuaded.

*Calcor* involved a request for production of documents through a nonparty subpoena which contained six pages of highly complex definitions and instructions, and which did not reasonably specify the documents sought. (*Calcor, supra*, 53 Cal.App.4th at pp. 219-220.) The appellate court reversed an order compelling the document production, concluding the party seeking the information failed "to provide focused, fact-specific justifications" for its demands which effectively sought "everything in [the nonparty's] possession having anything to do with [a particular product]." (*Id.* at p. 224.) In doing so, the court adopted the standard set forth in the statute concerning

17

document production from a party, which provides that the party seeking to compel production must "'set forth specific *facts* showing good cause justifying the discovery sought . . . .'" (*Ibid.*; see § 2031.310, subd. (b)(1).) It interpreted that language as requiring the submission of factual evidence through declarations. (*Calcor,* at p. 224.)

To begin, *Calcor* concerned production of documents and its analysis invoked an affirmative requirement imposed by statute on the party moving to compel production. The same requirement does not exist in the statute which governs motions to compel further responses to interrogatories. (§ 2030.300.) In that vein, case law is clear that in the interrogatory context, the burden is on the responding party to justify an objection or a failure to answer an interrogatory completely. (*Williams, supra*, 3 Cal.5th at p. 541; *Coy v. Superior Court* (1962) 58 Cal.2d 210, 220-221.)

Additionally, assuming without deciding that declarations are required to justify the document production sought, the situation in this case is a far cry from that which led *Calcor* to rule against the moving party in the situation before it. Here, the parties submitted to the trial court a variety of information by way of declaration. It included: (1) a copy of the CHP investigation report concerning the accident involving plaintiffs' vehicle; (2) documents detailing information about the three Kia recalls; (3) notices sent by KA to its Kia parts and service managers regarding the three Kia recalls; (4) design specifications and manufacturing details about various Kia models supplied by the Hyundai engineer; and (5) numerous NHTSA documents, including recall related reports and complaints filed with the NHTSA concerning fractured or fracturing CV shafts (or circumstances consistent therewith) in various Kia model vehicles. Simply put, the appellate record belies KA's contention that there was no evidence presented to the trial court

18

establishing relevance of the targeted information.

B.     *Admissible or Reasonably Calculated to Lead to the Discovery of Admissible Evidence*

The second component of the discoverability standard, that the targeted matters are admissible or appear reasonably calculated to lead to the discovery of admissible evidence, works to narrow the subject matter material to that which may be used at trial or reasonably may lead to uncovering evidence which may be used at trial.  Plaintiffs' propounded discovery was so tailored, focusing on fractured front CV shafts in front-wheel drive Kia vehicles and the manufacturing of such parts.  They did not, for example, request all information regarding all recalls issued by KA, all complaints received regarding any Kia vehicle or its components, or even all information concerning CV shafts in any vehicle distributed by KA.

The parties disagree about the ultimate admissibility of certain types of information to support a manufacturing defect claim, a matter on which we express no opinion.  Again, admissibility is not dispositive in the discovery context.  A "'claim that discovery is not warranted because the evidence disclosed would not itself be admissible is untenable.'"  (*Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1490.)  Indeed, ultimate admissibility is often difficult and sometimes impossible to determine at the discovery stage.  (See *Maldonado v. Superior Court* (2002) 94 Cal.App.4th 1390, 1397.)

Information concerning other CV shaft complaints and fractures, including KA's knowledge and handling thereof, could reveal information about Kia's front-wheel drive CV shafts, the manufacturing processes used, and/or instances of CV shaft manufacturing defects.  It may also reveal the names of business entities or people who might have further information

19

regarding those topics.  And, it could provide evidence admissible on the issue of punitive damages sought by plaintiffs.  (See Civ. Code, § 3294; *Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 592 [continuing pattern and practice of wrongful conduct can demonstrate that conduct vis-à-vis plaintiff was more blameworthy and warrants punitive damages to deter continued or repeated conduct of same nature]; *Magallanes v. Superior Court* (1985) 167 Cal.App.3d 878, 883 [in personal injury action, conscious disregard of safety may justify punitive damage award].)  These are just some examples.

C.          *Possession, Custody, or Control*

Another point of contention between the parties is the extent to which KA is obligated to provide information known to, and produce documents received or held by, its South Korea based parent company, KC. For example, one special interrogatory asked KA to "describe the manufacturing process by which the front axels (constate velocity shafts) to the 2017 Kia Forte5 were hardened, whether by heat-treating or other means, including the standards to be met during the metal hardening process."  KA's full response was the following:  "To the extent KA understands this interrogatory to seek documents or information created in connection with the development of the 2017 Kia Forte, KA responds that it is a distributor of certain Kia brand motor vehicles sold in the United States, and had no involvement in the design, manufacture, development or [Federal Motor Vehicle Safety Standards] compliance testing of any Kia vehicle, including the 2017 Kia Forte or any of its component parts.  [¶]  Objection is made to this interrogatory including the phrase 'manufacturing process' as vague, ambiguous, and overly broad."  It similarly responded to other interrogatories, and it objected to various requests for production of

20

documents "to the extent [they] would require KA to respond on behalf of entities other than itself."

Plaintiffs argued to the trial court that KA's interrogatory responses did not comply with the mandate of section 2030.220, subdivision (c), which provides: "If the responding party does not have personal knowledge sufficient to respond fully to an interrogatory, that party shall so state, but shall make a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, except where the information is equally available to the propounding party." In addition, they asserted the document production responses were deficient because documents held by KC are in the possession, custody or control of KA.

In opposition, KA defended its responses. It argued the documents sought were largely not in KA's possession, custody, or control, and were equally available to plaintiffs because they, like KA, could ask KC for them. Additionally, it asserted "technical documents and information, such as design documents . . . are not available or kept in the normal course of business by KA," but instead are in KC's possession. KA supported that contention with a declaration from KA's executive director of customer care which stated, inter alia: "KA and KC are separate, independent corporations"; and "[t]echnical documents and information, such as design documents regarding a particular vehicle's drive shaft and front axle, are highly confidential to KC and are not available or kept in normal course of business by KA."

The trial court briefly touched on the applicable legal standards in parts of its rulings. In the context of certain interrogatories, including the one previously quoted concerning the hardening process used for 2017 Forte

21

front axles, the trial court confirmed KA "is not required to respond to discovery on behalf of a non-party." Nevertheless, it found KA's responses to those interrogatories about its and KC's respective roles were evasive and ordered KA to provide further responses. And, when it ordered KA to provide a further response to a document production request, it did so with respect to matters in KA's "possession, custody, or control."

Left unresolved by the trial court, however, is the two-part crux of the parties' dispute. The first is whether KA, in declining to provide information from KC, complied with its interrogatory response obligations. Those obligations include: (1) providing all responsive information of which it has personal knowledge, which includes that from sources under its control (§ 2030.220; *Gordon v. Superior Court* (1984) 161 Cal.App.3d 157, 167); and (2) "mak[ing] a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations," except to the extent the information is equally available to plaintiffs (§ 2030.220, subd. (c); *Sinaiko Healthcare Consulting, Inc. v. Pacific Healthcare Consultants* (2007) 148 Cal.App.4th 390, 406).

The second is whether, and to what extent, a wholly owned subsidiary has possession, custody, or control over documents in its parent company's records, and whether KA meets the relevant standards vis-à-vis KC. (See § 2031.010, subd. (a).) To support their position on this issue in the trial court, plaintiffs cited federal decisions interpreting and applying some identical language used in the federal discovery context. (*U.S. Intern. Trade Com'n v. ASAT, Inc.* (D.C. Cir. 2005) 411 F.3d 245, 254; *U.S. v. Intern. Union of Petro. & Indus. Wkrs.* (9th Cir. 1989), 870 F.2d 1450, 1452; *First Nat. City Bank of N.Y. v. Internal Rev. Serv., Etc.* (2nd Cir. 1959), 271 F.2d 616, 618; *LG Display Co., Ltd. v. Chi Mei Optoelectronics Corp.* (S.D. Cal. January 28,

22

2009, No. 08cv2408-L), 2009 WL 223585; *Cooper Industries, Inc. v. British Aerospace* (S.D.N.Y. 1984), 102 F.R.D. 918, 919.) KA cited no case law to support its position, instead relying on plaintiffs' lack of citation to state case law.

Related to these issues, plaintiffs contend on appeal that the further interrogatory responses provided by KA following the court's original orders are inadequate. In addition, they argue KA is legally obligated to obtain information and documents from KC.

We leave these matters to the trial court to consider and determine in the first instance. KA's further responses were not at issue in the trial court proceedings that gave rise to these writ proceedings. Additionally, the trial court did not evaluate and determine whether KA has the requisite possession, custody, or control, and plaintiffs ask us to consider documents not available to the trial court in conjunction with their motions to compel.[3]

In sum, the trial court committed prejudicial error in limiting the scope of discovery to the 2014-2018 generation of Kia Forte vehicles. The portions of the motions to compel so limited, and the portions otherwise denied on the ground of relevance or failure to demonstrate the matters were reasonably calculated to lead to the discovery of admissible evidence, should

---

[3] The documents, filed as exhibits with plaintiffs' reply brief, consist primarily of certain KA discovery responses, including documents produced in conjunction therewith. KA filed objections to the documents. We treat the objections as a motion to strike, which we grant, except for exhibit 36 which KA concedes was before the trial court when it considered how to respond to the alternative writ. (See *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1096-1097.)

have been granted.[4]  Accordingly, issuance of a writ is warranted.

IV.

*Sanctions*

Along with their motions to compel, plaintiffs asked the trial court to award monetary sanctions against KA for misuse of the discovery process.  The court denied the request based on its belief that "both parties had substantial justification for bringing and opposing the motion[s]."  Plaintiffs' reply brief asks us "to grant [their] original request for sanctions in the combined total of $30,000.00."

A determination concerning sanctions is properly left to the trial court.  The applicable statute requires imposition of monetary sanctions against a party who unsuccessfully opposes a motion to compel unless the court makes an express finding that the party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.  (§§ 2030.300, subd. (d), 2031.310, subd. (h); *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 294.)  Because our conclusion regarding the motions to compel significantly alters the scope of the aspects on which KA was unsuccessful, and our reasoning sheds light on matters to be considered in evaluating the propriety of sanctions (see *City of Los Angeles v. Superior Court* (2017) 9 Cal.App.5th 272, 291 [party opposing discovery

---

[4]  We leave untouched two aspects of the trial court's orders, which denied relief to plaintiffs without prejudice, because they are unrelated to the matters contested in the writ proceeding.  They include:  (1) requests for production 24 and 25, seeking documents related to KA's marketing of the 2017 Kia Forte, which the court found to be vague and overbroad; and (2) special interrogatories 22 through 24, seeking information about KA's position regarding the CV shaft of plaintiffs' vehicle, for which the court found KA's responses were adequate.

24

sanction on substantial justification grounds bears burden of demonstrating its position was "'well-grounded in both law and fact'"]), the issue of sanctions should be reevaluated by the trial court.

## DISPOSITION

The writ petition is granted. Let a peremptory writ of mandate issue directing the trial court to (1) vacate the portions of its orders dated October 25, 2023, October 26, 2023, and April 12, 2024, which deny plaintiffs' motions to compel based on failure to demonstrate relevance, admissibility, or that the discovery requests or interrogatories are reasonably calculated to lead to the discovery of admissible evidence; (2) consider and determine the possession, custody, and control related issues disputed by the parties; and (3) enter a new and different order granting the motions as to the aforementioned requests and interrogatories, with inclusion of the court's reasoning and decision on the possession, custody, and control related issues. The stay previously issued by this court will dissolve upon issuance of the remittitur. (Cal. Rules of Court, rules 8.490(d), 8.272.) Plaintiffs are entitled to costs incurred in this writ proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(A).)

DELANEY, J.

WE CONCUR:

O'LEARY, P. J.

GOODING, J.